## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Jackie Chasse,                     :
    Plaintiff,                  :
                                :
v.                                 :
                                :   Case No. 3:05cv00691 (JBA)
Computer Sciences Corp.,           :
    Defendant.                  :

### Ruling on Defendant's Motion
### for Summary Judgment [Doc. # 27]

## I. INTRODUCTION

Plaintiff Jackie Chasse filed suit against Computer Sciences
Corporation ("CSC") alleging disability discrimination under the
Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§
1211, et seq., and the Connecticut Fair Employment Practices Act
("CFEPA"), § 46a-60(a)(1).[1]  Defendant CSC now moves pursuant to
Fed. R. Civ. P. 56 for summary judgment, and, for the reasons
that follow, its motion will be granted.

### A. Factual Background

The following facts are drawn from the parties' Local Rule
56(a) statements and supporting exhibits.  From July 1995 until
September 2003, plaintiff Jackie Chasse was employed at CSC's
Mainframe Automation Group ("MFA Group") as a Computer Systems

---

[1] The original five-count complaint included claims for
Breach of Covenant of Good Faith and Fair Dealing, Promissory
Estoppel and Negligent Misrepresentation.  These claims were
voluntarily dismissed by plaintiffs.  See Stipulation of
Dismissal [Doc. # 13], Count III; Stipulation of Dismissal [Doc.
# 25], Count IV, IV.

Specialist.  (See Pl. Dep., Def. R. 56(a)(1) App. [Doc. #29] Ex. 1, at 40, 61-62.)  CSC, an information technology ("IT") services company, provides outsourcing of IT services, whereby CSC clients turn over their computer and IT responsibilities to CSC.  (See Bayer Aff., Def. Ex. 22 ¶ 3.)  As part of the MFA group, plaintiff provided maintenance, conversion and support to the computers of CSC clients, via a mainframe[2] located at CSC headquarters.  (See Pl. Dep. at 41, 49.)  Plaintiff's other duties included quality management and support, as well as training temporary employees and new automation staff.  (See Pl. Opp. Mem. [Doc. # 32-1] at 2.)

Prior to working for CSC, plaintiff had worked for Southern New England Telephone ("SNET"), in automation support.  (See Pl. Dep. at 36-37.)  When SNET outsourced its data processing to CSC in 1995, CSC acquired all the SNET employees involved in data processing, including the plaintiff.  (See id. at 38.)  Although technically employed by CSC, plaintiff continued to conduct automation support for SNET.  (See id. at 39.)  Plaintiff eventually moved to CSC's Meriden, Connecticut offices, where she began conducting mainframe support for additional CSC clients.  (See id. at 42-43.)  Sometime in 1997, plaintiff began automation support for the U.S. Department of Education.  (See id. at 49.)

_____

[2] A mainframe computer is a large master computer into which other, less powerful computers connect.  See Pl. Dep. at 81.

This work required plaintiff to obtain an FBI security clearance. (See id. at 56; Pl. Aff., Pl. R. 56(a)(2) App. [Doc. #34] Ex. E ("Pl. Ex. E") ¶ 24.)  Plaintiff also conducted automation support for several other clients, including Montgomery Kone, SAPPI, Houghton Mifflin, Standard Register, Baker & Taylor, Factory Mutual, WCI and Net I.  (See Pl. Dep. at 49-50.)

Plaintiff was diagnosed with Charcot Cartilage and diabetes in or around 1999.  (See Pl. Opp. Mem. at 2.)  Charcot Cartilage is a condition often afflicting diabetics like plaintiff that weakens the joints in the foot.  (See id.)  As a result of these conditions, plaintiff suffered from foot ulcers and related wound management issues, which caused her to take a six-month medical leave from CSC in January 1999.  (See Pl. Dep. at 74.)  After plaintiff recovered, she returned to her former position within CSC's MFA Group.  (See id. at 76.)  Plaintiff's initial return to CSC was only partial - she went without pay twice a week to attend physical therapy sessions.  (See id.)

According to defendant, CSC downsized the MFA Group sometime in 2001-2002, and plaintiff narrowly missed being laid off.  (See Def. Ex. 22 ¶ 5.)  Michael Bayer, the supervisor of the MFA Group, rank-ordered the employees of the MFA Group based on performance reviews, skill sets and ability to contribute to the MFA Group's goals.  (See id.)  Out of a total of seven employees, plaintiff was ranked fifth.  (See id.)  The two lower ranked

3

employees were both laid off.   (See id.)

In August 2002, plaintiff slipped in the basement of her home and broke her ankle.   (See Pl. Dep. at 136.)   The bones in plaintiff's ankles were irreparably shattered, and doctors fused bones taken from plaintiff's leg with her remaining ankle bones. (See id.)   The plaintiff's injury was compounded by her Charcot Cartilage and diabetes, and for a while she was unable to walk. (See id. at 74-75, 131-33.)   Plaintiff requested and was granted medical leave effective August 13, 2002.   (See id. at 139-142.) Plaintiff received a detailed letter from CSC explaining the federal Family and Medical Leave Act ("FMLA"), see 29 U.S.C. 2612, and CSC's own policy concerning unpaid medical leaves of absence.   (See id. at 138; Def. Ex. 4.)

As outlined in CSC's letter, plaintiff was entitled to twelve weeks of job protected leave under the FMLA.[3]   (See Def. Ex. 4.)   If plaintiff did not return to work after twelve months of unpaid medical leave, however, plaintiff's employment would be administratively terminated.   (See Def. Ex. 4.)   The letter also indicated that plaintiff must first use her sick leave and vacation time prior to commencing unpaid leave.   (See id.) Plaintiff's unpaid leave began on September 9, 2002, when her sick and vacation time ran out.   (See Pl. Dep. at 141-42.)

---

[3] Plaintiff was actually entitled to sixteen weeks under the Connecticut Family Medical Leave Act ("CFMLA"), Conn. Gen. Stat. § 31-51ll.

Plaintiff's statutory job protection under FMLA ended on November 5, 2002, and her CFMLA protection ended on December 3, 2002.

While plaintiff was on unpaid, unprotected leave during spring 2003, CSC instituted Project Capricorn, a reduction in force ("RIF") and reorganization initiative headed by Sanjay Salva, Director of CSC's Automation and Global Management Centers.  (See Def. Ex. 22 ¶ 7.)  Project Capricorn was designed to cut CSC's labor and overhead costs by: 1) reducing the number of U.S. employees; 2) relocating some U.S.-based work to less expensive labor sources in Australia, India and South Africa; and 3) consolidating the remaining U.S.-based work among the remaining U.S. employees.  (See id.)  While plaintiff claims she lacks sufficient knowledge to admit or deny that Project Capricorn existed, she was aware that CSC was engaging in an off-shoring initiative.  (See Pl. R. 56(a)(2) Stmt. [Doc. #32-2] ¶¶ 40-44; Def. R. 56(a)(1) Stmt. ¶¶ 40-44; Pl. Dep. at 17-18.)

As part of Project Capricorn, Michael Bayer was instructed by Salva to reduce the number of positions within the MFA Group by four full-time positions.  (See Def. Ex. 22 ¶ 8.)  He was also instructed to reduce the number of positions within the Midrange Group, another group he supervised.  (See id.)  At the time Project Capricorn was initiated, the MFA Group had eleven members - seven permanent employees (including plaintiff), and four employees on "loan" from CSC's Internal Work Orders ("IWO")

division.   (See id. ¶ 10.)  According to defendant, the four
loaned employees did the work of three full-time MFA employees.
(See id.)

      Bayer first eliminated the IWO employees because they were
borrowed staff who joined the MFA Group to fulfill a temporary
need.  (See id.; Pl. Dep. at 176-77.)  The record is unclear as
to whether these employees were actually laid off or simply sent
back to the IWO division.  It is also unclear whether Bayer laid
off any employees in the Midrange Group.  Regardless, because
Bayer was instructed to eliminate four MFA Group positions and
the IWO employees only did the work of three MFA employees, one
full-time, permanent MFA employee also needed to be laid off.
(See Def. Ex. 22 ¶ 12.)

      According to defendant, Bayer next evaluated each member of
the MFA Group to decide which employees could not be laid off.
(See id.)  Five MFA employees were eliminated from consideration
because of either their geographic location or specific skill-
set.  (See id. ¶¶ 13-17.)  Defendant asserts that Robert
Frederick, who worked on-site in Long Beach, California for the
CSC client Raytheon, could not be laid off because Raytheon
required a CSC employee to be located on-site to provide their
automation services.  (See Def. Ex. 22 ¶ 13.)  Robert Dion was
deemed indispensable because he was the primary source for
mainframe support to the United Technologies Company ("UTC").

(See Def. Ex. 12; Def. Ex. 22 ¶ 13.)  Dion worked on-site at
UTC's Meriden, Connecticut offices.  (See id.)  Paul McMahon
worked on-site in Rockford, Illinois for UTC.  (See Def. Ex. 12.)
Defendant asserts that McMahon could not be eliminated because he
was the sole source of on-site mainframe knowledge for UTC in
Illinois.  (See Def. Ex. 22 ¶ 14.) Joe Szaflarski was the sole
source of mainframe knowledge at CSC's Newark, Delaware center.
(See Def. Ex. 12.)  Szaflarski was deemed indispensable because
he worked at CSC's Delaware data center, which was a major hub of
CSC operations, and he was the highest performer in the MFA Group
on a regular basis.  (See Def. Ex. 22 ¶ 15.)  He also had
extensive knowledge of two of CSC's large accounts, DuPont and
Equiva.  (See id.)  Brendan Keenan was the sole source for on-
site mainframe knowledge or the CSC client, General Dynamics.
(See Def. Ex. 12.)  Defendant asserts that General Dynamics
expected a CSC employee to be on-site for its mainframe
operations, hence Dion could not be laid off.  (See Def. Ex. 22 ¶
17.)

     That left Bayer with the decision of either laying off
Richard Glaude or plaintiff.  (See id.)  According to defendant,
Bayer relied on various types of objective and subjective
criteria to compare Glaude with plaintiff.  Based on fiscal year
performance appraisals, depth and breadth of skills and quantity
of work performed, Bayer decided to lay off plaintiff.  (See id.)

In fiscal year 2002 performance appraisals, Glaude rated higher than plaintiff in the areas of "Knowledge," "Planning and Organization," "Ability to Work Independently," "Ability to Meet Prescribed Schedules Within Cost Constraints," and "Quality of Output." (See Def. Ex. 10, 11.)  Plaintiff was rated higher than Glaude in the areas of "Judgment/Decision Making/Problem Solving" and "Ability to Lead Activities of Others."  (Id.)  In the "Performance Summary for this Review Period" section, both plaintiff and Glaude were rated a level "3", which meant: "Good: Performance consistently meets expectations and job requirements. May exceed expectation from time to time."  (Id.)

Defendant also notes that Glaude was more highly skilled than plaintiff in Computer Associates Automation Point ("Automation Point"), and plaintiff admits that Glaude was an "expert" in Automation Point and was more skilled in it than she was.  (See Def. Ex. 22 ¶ 22; Pl. Dep. at 145-46, 149.)  According to defendant, Automation Point allows a user to access a variety of mainframes from one computer screen, making it an important tool for CSC and its clients.  (See Def. Ex. 22 ¶ 21-c.)  Glaude was spending much of his time working on Automation Point at the time of Project Capricorn and had the highest skill level in the MFA Group in this area.  (See id.)

Bayer also considered the quantity of plaintiff's work. Plaintiff's largest task, converting numerous Department of

Education mainframes to a more advanced automation software system, was approximately 75% complete when plaintiff went on leave in August 2002.  (See id. at 117-19; Def. Ex. 22 ¶ 22-a.) The remaining systems were converted after plaintiff went on leave, leaving the MFA Group only to conduct maintenance on the remaining Department of Education systems.  (See Pl. Dep. at 123-24; Def. Ex. 22 ¶ 22-a.)  The record does not show whether other members of the MFA Group had the required security clearance to conduct work on the Department of Education account, or whether such clearance was required to perform only maintenance. According to defendant, several of the other clients for whom plaintiff conducted work discontinued their contracts with CSC while plaintiff was on leave.  (See Def. Ex. 22 ¶ 22-a.) Plaintiff's work for Houghton Mifflin, Standard Register, Baker & Taylor, SAPPI, Factory Mutual, WCI and Net I, was "off-shored" to Australia.  (See id.)

Prior to going on leave, plaintiff also spent approximately 10-20 hours per week as a quality manager for obtaining ISO certificates pursuant to government audits.  (See Pl. Dep. at 101-03.)  According to plaintiff, this type of work was physically and mentally exhausting, and she asked her supervisors to relieve her of ISO certification in June 2002.  (See id.) Thus, by spring 2003, much of plaintiff's workload had been discontinued or reassigned.  (See Def. Ex. 22 ¶ 22-c.)  Defendant

claims that Bayer made the decision sometime in late spring 2003 to lay off plaintiff pursuant to the goals of Project Capricorn. (See id. ¶¶ 24-25.)  According to a manager within the MFA Group who reports to Michael Bayer, plaintiff's work for various CSC clients was transferred to Australia.  (See Theml Aff., Def. Ex. 24 ¶ 9.)  The remaining work for the Department of Education was assumed by Glaude and Keenen.  (See id.)

While plaintiff's position was eliminated in spring 2003, she was not notified of this decision, nor was she officially terminated.  (See Def. Ex. 22 ¶ 26.)  She was permitted to continue on her medical leave, so as to retain her medical and other benefits through CSC.  (See id.)  According to Simmie Hoeft, the CSC employee who oversaw plaintiff's medical leave, it was standard practice to allow individuals on approved medical leave to remain CSC employees until they either returned to work or failed to return to work after twelve months of unpaid leave. (See Hoeft Aff., Def. Ex. 23 ¶ 3.)  Hoeft claimed that CSC does not notify employees in plaintiff's situation because another job within CSC could become available to the employee and because CSC wants to avoid causing unnecessary stress to the employee.  (See id.)  Thus, while plaintiff's job had technically been eliminated, she remained unaware of that fact through summer 2003.

On August 7, 2003, plaintiff's orthopedist, Richard Zell,

faxed a Work Release Form to Hoeft.  (Pl. Dep. at 151-52; Def.
Ex. 13.)  The form indicated that plaintiff would be able to
return to work, with accommodation, on September 2, 2003.  (See
Def. Ex. 13.)  The accommodation required by plaintiff was that
she be able to work from home because she remained in a foot-cast
and had limited mobility.  (See id.; Pl. Dep. at 151, 203.)  The
note also indicated that plaintiff would be re-examined on August
29, 2003.  (See Def. Ex. 13.)  According to defendant, plaintiff
also emailed Bayer and Theml on August 7, 2003, to inform them
that she expected to return to work on September 2, 2003.  (See
Def. Ex. 22 ¶ 27; Def. Ex. 24 ¶ 11.)  Bayer notified Hoeft that
plaintiff's position had been eliminated while she was on leave.
(See Def. Ex. 23 ¶ 5; Def. Ex. 22 ¶ 27.)  An email sent by Bayer
to Joe Mazzagatti, a CSC employee, on August 13 indicates that
Bayer was aware of plaintiff's plan to return to work.  (See Pl.
Ex. C.)  In it, Bayer asks Mazzagatti for guidance on how to
handle plaintiff's return to work request even though "her
function was offshored [sic]."  (See id.)

     According to plaintiff, when she made her request to return
to work, she was informed that CSC would be unable to accommodate
her disability.  (See Pl. Dep. at 13-14.)  Sometime later in
August, Bayer told plaintiff that the reason CSC could not
accommodate her disability was because her position at CSC had
been eliminated.  (See id. at 13-15.)  This surprised plaintiff,

11

who thought that her job was secure from "off-shoring" because of the required security clearance needed to conduct work on the Department of Education account.  (See id. at 55-57.)

Sometime in August, plaintiff was put in touch with Connie Hudson, director of CSC's Employee Mobility Program, a program designed to help CSC employees and former employees locate available jobs within CSC.  (See Hudson Aff., Def. Ex. 25, ¶¶ 2-4.)  Hudson emailed a spreadsheet of hundreds of available positions within CSC to all participants in the program, but plaintiff never emailed any hiring managers or human resources personnel to inquire about available positions.  (See id. ¶¶ 4-5; Pl. Dep. at 207, 210.)  Plaintiff testified that she did not inquire further because she was either not qualified for the available jobs or the jobs were too physically taxing, given her disability.  (See Pl. Dep. at 207-10.)

On August 29, 2003, plaintiff had another examination by Dr. Zell.  (See id. at 152; Def. Ex. 14.)  That day, after the examination, Dr. Zell faxed a summary of plaintiff's condition to CSC.  (See Def. Ex. 14.)  The summary noted that plaintiff was not experiencing serious pain, that her cast was removed, and that she was suffering no skin breakdown.  (See id.)  Dr. Zell wrote that further surgery might be required and that "Ms. Chasse continues to be totally disabled.  Her work status will be reassessed when seen again in one month."  (See id.)  The summary

did not reference Dr. Zell's earlier medical clearance to work on
September 2, 2003.  (See id.)  Defendant asserts that Dr. Zell's
note meant plaintiff's clearance to return to work was revoked.
(See Def. R. 56(a)(1) Stmt. ¶ 154.)  Plaintiff acknowledged in
her deposition testimony that Dr. Zell had revoked her work
release clearance.  (See Pl. Dep. at 153.)  Plaintiff testified:

> **Q:**  So although Mr. – excuse me, although Dr. Zell had
>         thought come September you would be released to
>         return to work with restrictions, what happened
>         was he saw you again at the end of August?
> **A:**  Yes.
> **Q:**  And he saw you on August 29, and he then
>         determined that you couldn't work even with
>         restrictions?
> **A:**  I guess so, yes.

(Id.)  Plaintiff now contends that Dr. Zell's note on August 29,
2003 did not revoke her work clearance and she still would have
been able to work from home.  (See Pl. R. 56(a)(2) Stmt. ¶ 154.)

     According to defendant, on September 8, 2003, plaintiff
discussed her situation with her Leave Representative.  (See Def.
Ex. 23 ¶ 6.)  Hoeft explained to plaintiff that if she attempted
to return to work, she would be laid off pursuant to the RIF and
would receive severance pay in lieu of notice.  (See id.; Pl.
Dep. at 190-91.)  According to Hoeft, if plaintiff attempted to
return to work, she would be precluded from receiving long-term
disability benefits because she would be attesting that she was
no longer disabled.  (See Def. Ex. 23 ¶ 6.)  On the other hand,
Hoeft explained, if plaintiff did not attempt to return to work,

she would be administratively terminated pursuant to CSC's twelve-month leave policy, which would enable plaintiff to potentially receive long-term disability benefits.  (See id.) Thereafter, Hoeft claims that plaintiff decided to provide a note confirming that she was unable to return to work.  (See id.) Hoeft reported the details of her conversation with plaintiff in an email to various other individuals, dated September 8, 2003:

> I spoke with Jacquline [sic] Chasse.  Per Jackie, she is not able to work at this time and is going to fax me an updated dr's note indicating that she is not able to work.  I explained to her that since she is not able to work she will not be laid off, no[r] [sic] is she eligible for any serverance [sic] package.  However, LTD benefits will continue for as long as she is disabled.  She understood.

(Def. Ex. 15.)

Later on September 8, 2003, Dr. Zell faxed another note to CSC stating: "Ms. Chasse will be out of work approximately 2-3 months."  (See Def. Ex. 2.)  Plaintiff maintains that she was still medically cleared to work from home with the proper accommodations, that she was not eligible for long-term disability, and that the September 8 note reflected an economic decision, not a medical one.  (See Pl. R. 56(a)(2) Stmt. ¶¶ 160, 161, 166.)

When plaintiff did not return to work on September 9, 2003, she was administratively terminated pursuant to CSC's twelve-month leave policy.  (See Def. Ex. 23 ¶ 9; Def. Ex. 7.) According to defendant, even if plaintiff attempted to return to

14

work prior to September 9, 2003, CSC would have been mandated to turn her away because she was not medically cleared to return to work.  (See Def. Ex. 23 ¶ 10.)  CSC's Human Resources Management Policy indicates that employees returning from unpaid medical leave must provide appropriate medical clearance, which is subject to independent verification, as CSC requests.  (See Def. Ex. 6 at 8.)  Plaintiff maintains that Dr. Zell's note indicates she was able to work from home on September 2, 2003.  (See Pl. R. 56(a)(2) Stmt. ¶ 166.)  However, defendant argues that, regardless, plaintiff's job was eliminated in spring 2003 due to reorganization of CSC.  (See Def. Mem. [Doc. #28] at 36.)

## II.  STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law."  Rodriguez v. City of N.Y., 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  When evaluating a motion for summary judgment, the Court draws all reasonable inferences in the light most favorable

15

to the non-moving party.  See Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986).  If a summary
judgment motion appears adequately supported, the opposing party
must then come forward with evidence that would be sufficient to
support a jury verdict in his or her favor.  See Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Matsushita, 475
U.S. at 587 ("Where the record taken as a whole could not lead a
rational trier of fact to find for the nonmoving party, there is
no genuine issue for trial.") (citation and internal quotation
omitted).  A non-moving party's "mere speculation or conjecture
as to the true nature of the facts" will not, by itself, defeat a
motion for summary judgment.  Knight v. U.S. Fire Ins. Co., 804
F.2d 9, 12 (2d Cir. 1986).  "Summary judgment is appropriate even
in discrimination cases [and] trial courts should not treat
discrimination differently from other ultimate questions of
fact."  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.
2000) (citing inter alia Reeves v. Sanderson Plumbing Prods.,
Inc., 530 U.S. 133, 148 (2000) (internal citations omitted)).
Summary judgment is appropriate in discrimination cases "where a
plaintiff's argument is based on conclusory allegations of
discrimination and the employer provides a legitimate rationale
for its conduct."  Martin v. Town of Westport, 329 F. Supp. 2d
318, 325 (D. Conn. 2004) (citations omitted).

## III. DISCUSSION

_____Plaintiff's suit alleges that CSC failed to accommodate her disability, and that the lack of accommodation led to her termination in violation of the ADA, 42 U.S.C. §§ 1211, et seq., and the CFEPA, § 46a-60(a)(1).[4]  The ADA prohibits discrimination on the basis of disability, and defines discrimination to include both adverse employment actions based on the employee's disability, see 42 U.S.C. § 12112(a), and "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business. . .," 42 U.S.C. § 12112(b)(5)(A).

"A plaintiff alleging employment discrimination under the ADA bears the initial burden of establishing a prima facie case." Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869 (2d Cir. 1998) (citing Wernick v. Fed. Reserve Bank of N.Y., 91 F.3d 379, 383 (2d Cir. 1996)).  To establish a prima facie case, plaintiff must initially establish: 1) she was a member of a protected group; 2) she was qualified to perform the essential functions of the job, with or without accommodation; 3) she suffered an adverse

---

[4] Claims for violations of the CFEPA are analyzed under the same standards as claims for violations of the ADA. See Ann Howard's Apricots Rest. v. Comm'n on Human Rights & Opportunities, 237 Conn. 209, 224-26 (1996).

employment decision; and 4) the adverse employment decision occurred under circumstances giving rise to a reasonable inference of discrimination.  *See* *Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d Cir. 2005) (citations omitted); *Harper v. Metro. Dist. Comm'n*, 134 F. Supp. 2d 479, 483 (D. Conn. 2001).  The plaintiff's burden of establishing a *prima facie* case of employment discrimination is *de minimis*.  *See* *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (concerning a Title VII racial discrimination claim); *accord* *Treglia v. Town of Manlius*, 313 F.3d 713 (2d Cir. 2002) (applying the *Chambers* *de minimis* standard to an ADA discrimination claim); *Curran v. All-Waste Sys.*, No. 99-9250, 2000 U.S. App. LEXIS 11025 (2d Cir. May 16, 2000) (applying *Chambers* to an ADA retaliation claim); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87 (2d Cir. 2001) (applying *Chambers* in the Age Discrimination in Employment Act context).

Defendant challenges three of the four prongs of plaintiff's *prima facie* case.  First, defendant asserts plaintiff is not a member of a protected group because plaintiff's condition does not reach the level of "disabled" under the ADA.  Second, defendant asserts plaintiff was not qualified to perform the essential functions of her job because plaintiff was unable to return to work in any capacity.  Third, defendant argues there are no circumstances giving rise to any inference of

18

discrimination in the elimination of plaintiff's position.  The Court's determinations as to each of the three contested prongs of plaintiff's <u>prima facie</u> case follow.[5]

## A. Member of a Protected Group

The ADA defines disability as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).  At issue here are subsections (A) and (C). Defendant claims that plaintiff's broken ankle, complicated by her Charcot Cartilage and diabetes, does not amount to a disability under subsection (A).  Defendant also contends that there is no evidence it regarded plaintiff as disabled under subsection (C).

In <u>Bragdon v. Abbott</u>, 524 U.S. 624 (1998), the Supreme Court articulated a three-step process for determining whether a plaintiff has a disability under subsection (A).  First, the Court must determine whether the plaintiff suffers from a physical or mental impairment.  <u>See</u> <u>id.</u> at 631.  Next, the Court must identify the life activity upon which the plaintiff relies and "determine whether it constitutes a major life activity under the ADA."  <u>Id.</u>  Finally, "tying the two statutory phrases together, [determination is made] whether the impairment

---

[5] Defendant does not contest that plaintiff's layoff was an adverse employment action.  (Def. Mem. at 23-24 n. 22.)

substantially limit[s] the major life activity." Id.  "In order
to be eligible to prevail upon a further showing of
discrimination, a plaintiff must satisfy each of the three
prongs." MacGovern v. Hamilton Sunstrand Corp., 170 F. Supp. 2d
301, 308 (D. Conn. 2001) (quoting Colwell v. Suffolk Cty. Police
Dep't., 158 F.3d 635, 641 (2d Cir. 1998)).

### 1. Physical Impairment

The Equal Employment Opportunity Commission (EEOC)
regulations define physical impairment as "[a]ny physiological
disorder, or condition, cosmetic disfigurement, or anatomical
loss affecting one or more of the following body systems:
neurological, musculoskeletal . . . digestive, genito-urinary,
hemic and lymphatic, skin, and endocrine."  29 C.F.R. §
1630.2(h)(1).  Plaintiff contends that she suffered from Charcot
Cartilage and diabetes, and that these conditions exacerbated the
effect of her broken ankle.  (Pl. Opp. Memo. at 2.)  Dr. Zell's
undisputed evaluation confirms this and states that plaintiff was
"totally disabled" (Def. Ex. 14).  Based on plaintiff's averments
and Dr. Zell's evaluation, a reasonable jury could conclude that
plaintiff had a physiological disorder or condition that affected
her musculoskeletal system.  Thus, plaintiff has established an
"impairment" under the ADA.

### 2. Major Life Activity

"The need to identify a major life activity that is affected

by the plaintiff's impairment plays an important role in ensuring
that only significant impairments will enjoy the protection of
the ADA." Reeves v. Johnson Controls World Servs., Inc., 140
F.3d 144, 152 (2d Cir. 1998).  "In deciding whether a particular
activity is a 'major life activity', [the Court must] ask whether
that activity is a significant one within the contemplation of
the ADA, rather than whether that activity is important to a
particular plaintiff." Colwell, 158 F.3d at 642.  Plaintiff
testified that when she broke her ankle, she was wheelchair-bound
and unable to walk.  (See Pl. Dep. at 131.)  As of August 2003,
plaintiff could only walk or stand for thirty minutes at a time
and then required a fifteen minute break.  (See id. at 129-33.)
It can be inferred from plaintiff's testimony and Dr. Zell's
letters that plaintiff's impairments also affected her ability to
work.  EEOC guidelines indicate that walking and working are
considered major life activities.  See 29 C.F.R. § 1630.2(i)
("Major Life Activities means functions such as caring for
oneself, performing manual tasks, walking, seeing, hearing,
speaking, breathing, learning, and working").

### 3. "Substantially Limits"

The third step in the Bragdon analysis is to inquire
whether the impairment at issue substantially limits the major
life activities identified in step two.  See MacGovern, 170 F.
Supp. 2d at 309 (citing Colwell, 158 F.3d at 643).  "Although

21

almost any impairment may, of course, in some way affect a major life activity, the ADA clearly does not consider every impaired person to be disabled.  Thus, in assessing whether a plaintiff has a disability, courts have been careful to distinguish between impairments which merely affect major life activities from those that substantially limit those activities." <u>Ryan</u>, 135 F.3d at 870.

Whether an impairment substantially limits a major life activity is determined on a case-by-case basis.  <u>See</u> <u>Reeves</u>, 140 F.3d at 151; <u>McGovern</u>, 170 F. Supp. 2d at 309.  The EEOC implementing regulations define the term "substantially limits" to mean:

> 1) Unable to perform a major life activity that the average person in the general population can perform; or 2) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  The regulations further provide that when determining whether an individual is substantially limited in a major life activity, the fact-finder must consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or expected permanent or long-term impact of or resulting from the impairment. <u>See</u> C.F.R. § 1630.2(j)(2).  "The language of these regulations demonstrates that the inquiry is a

22

comparative one."   MacGovern, 170 F. Supp. 2d at 309.

Again, plaintiff testified that she can only stand or walk for thirty minutes at a time without taking a fifteen minute break.  (See Pl. Dep. at 129-33.)  Although her condition was improving with physical therapy, the restrictions related to standing and walking were considered long-term.  (See id. at 133-34.)  After the ankle break, muscles in plaintiff's feet atrophied due to her diabetes and Charcot Cartilage, and Dr. Zell indicated that plaintiff remained "totally disabled" and that further surgery on plaintiff's feet could be required.  (See id. at 133-34; Def. Ex. 14.)  Thus, while a typical ankle break might not substantially limit a major life activity, plaintiff's conditions of diabetes and Charcot Cartilage could be found to have exacerbated the effects of her break such that she was left with a long-term impairment.

Plaintiff's inability to walk for long periods of time must be measured against the average person's ability to walk. Assuming that the average person is able to stand or walk for periods longer than thirty minutes without taking a fifteen minute break, plaintiff's documented impairment substantially restricted her ability to perform the major life activity of walking.[6]

---

[6] Because plaintiff has produced sufficient evidence that her impairment substantially restricted her ability to walk, the Court need not decide whether her impairment also substantially

Plaintiff therefore can establish the first prong of her prima facie case — that she did suffer from a physical impairment under the ADA,[7] and the Court will not address whether there is sufficient evidence that defendant CSC regarded plaintiff as physically impaired.

**B. Qualified to Perform Job With or Without Accommodation**

Defendant next argues that plaintiff's prima facie case fails because she was "not medically able to return to work." (Def. R. 56(a)(1) Stmt. ¶ 166.)  Plaintiff's brief argues that defendant's unwillingness to accommodate her disability by letting her work from home was the ultimate basis of termination of her employment.  (Pl. Compl. [Doc. #1] at 5-6; Pl. Opp. Mem.

---

restricted her ability to perform the major life activity of working.

[7] Contrary to defendant's argument, plaintiff has also established a prima facie case of physical impairment under the CFEPA.  The ADA and CFEPA define "disability" differently.  The ADA's definition is "more restrictive than CFEPA's."  See Curry v. Allan S. Goodman, Inc., 2004 WL 3048590 (Conn. Super. Ct. Nov. 18, 2004) (citing Hill v. Pfizer Inc., 266 F. Supp. 2d 352, 364 (D. Conn. 2003)).  Unlike the ADA, the CFEPA does not require that plaintiff's impairment substantially limit a major life activity.  See id. (citing Beason v. United Tech. Corp., 337 F.3d 271, 275 (2d Cir. 2003)).  Thus, the only inquiry under plaintiff's CFEPA claim is whether plaintiff suffers from a "chronic physical handicap, infirmity, or impairment."  See Conn. Gen. Stat. § 46a-51(15).  "Chronic" means "marked by long duration or frequent recurrence" and "always present or encountered."  See Curry, 2004 WL 3048590, at *4 (quoting Webster's Tenth Collegiate Dictionary).  Plaintiff comes within this definition.  Dr. Zell's August 29 examination deemed plaintiff "totally disabled", and plaintiff considered her condition "permanent."  (See Def. Ex. 14; Pl. Dep. at 133-34.)

at 12-13.)  Defendant maintains, however, that plaintiff's request for accommodation "could not be met (regardless of technical feasibility or past practice) because her position no longer existed."  (Def. Reply [Doc. #36] at 9 (emphasis in original).)  In the alternative, defendant argues that plaintiff could not work even with accommodation, relying on Dr. Zell's evaluation of August 29, 2003, which found plaintiff "totally disabled," and his September 8, 2003 note stating that plaintiff would be unable to work for two to three additional months.  (See Def. Ex. 13, 14.)  Plaintiff does not dispute that, on the face of Zell's August 29 note, her medical clearance to work even with restrictions was revoked (see Pl. Dep. at 152-53), and she admits that she "was still mostly bedridden" "[a]t the time [her] leave was drawing to a close" (id. at 13).  Yet, because she did not know "how long [she would] stay totally disabled" (id. at 153), she apparently expected to be "ready to return" to work by September 2003 (id. at 16-17).[8]

Defendant offers exhibits showing that, after speaking with CSC human resources employee Hoeft on September 8, 2003,

_____

[8] Plaintiff disputes defendant's contention that, "had Plaintiff attempted to return to work on September 9, 2003, CSC would have been forced to turn her away due to Dr. Zell's September 8, 2003 note explicitly stating that Plaintiff was not medically able to return to work" (Def. R. 56(a)(1) Stmt. ¶ 166), arguing that she "had been cleared to work with an accommodation — work from home.  This is completely consistent with the plaintiff being disabled" (Pl. R. 56(a)(2) Stmt. ¶ 166).

25

plaintiff made the calculated economic decision not to return to work and to apply for long-term disability instead of receiving severance for being laid-off (see Def. Ex. 23 ¶ 6[9]).  Although plaintiff denies having been eligible for long-term disability (Pl. R. 56(a)(2) Stmt. ¶ 161), she does admit representing to Hoeft that she was "not able to work" as of September 8, 2003 (id. at 163), an undisputed fact confirmed by the note faxed from Dr. Zell to Hoeft later that day, stating "Ms. Chasse will be out of work approximately 2-3 months" (Def. Ex. 2).  (See Def. R.

---

[9] This paragraph from the Hoeft affidavit reads:

    6. My Medical Leave Activity Notes indicate that I spoke with Ms. Chasse on September 8, 2003, one day prior to her administrative termination deadline.  She informed me that she was not able to work and inquired about the possibility of receiving unemployment benefits.  I explained that she could not receive unemployment benefits if she was unable to work.  I further explained the consequences of Ms. Chasse returning to work versus letting the administrative termination occur on the following day: If Ms. Chasse returned to work, she would be laid off pursuant to the reduction in force, and would receive severance in the form of pay in lieu of notice.  Thereafter, however, Ms. Chasse would not receive long term disability benefits because, by returning to work, she would make clear that she was no longer entitled to such benefits. On the other hand, if Ms. Chasse was administratively terminated, she would not receive any severance but would still be eligible for long term disability benefits pursuant to the terms of the policy.  Ms. Chasse informed me that she would provide a doctor's note confirming that she was unable to return to work. A true and correct copy of my notes from September 8th are attached to this Affidavit.

(Def. Ex. 23 ¶ 6.)

56(a)(1) Stmt. ¶¶ 156-65.)  However, plaintiff believed she would eventually return and that defendants could then accommodate her, as they had done in the past.  (See Pl. Dep. at 78.)

It is "axiomatic that an individual cannot perform the essential functions of a job if she is completely unable to work regardless of accommodation," Henzel v. Del. Otsego Corp., 285 F. Supp. 2d, 276 (N.D.N.Y. 2003) (internal citations omitted). Because plaintiff's own doctor described Ms. Chasse as "totally disabled" on August 29, 2003 (Def. Ex. 14) and was unwilling to give her clearance to return to work, even with accommodation (Def. Ex. 2), by the end of her unpaid medical leave period, the undisputed facts demonstrate that plaintiff was not qualified to perform her job by the end of her medical leave.  Ms. Chasse offers no evidence to contradict defendant's contention that the written statement by Dr. Zell on September 8, 2003, "Ms. Chasse will be out of work approximately 2-3 months" (Def. Ex. 2), meant that she could not work at all by the following day, which marked the expiration of her leave period.  Thus, even considering the record in the light most favorable to the plaintiff, a jury could not conclude that plaintiff's physician approved her to resume work, even from home, as of the administrative employment termination deadline.  Thus, plaintiff has offered insufficient evidence to rebut defendant's showing that she was not able to return to work at the conclusion of her administrative leave on

September 9, 2003.

### C. Adverse Employment Decision Occurring Under Circumstances Giving Rise to a Reasonable Inference of Discrimination

Even if plaintiff were able to rebut defendant's showing as to the third prong, she cannot do so with respect to the fourth prong.  In ADA discrimination cases, the kinds of "circumstances" necessary to prove the fourth prima facie element have been found to include:

> 1) the employer sought to replace a discharged plaintiff with another person possessing the same qualifications, although not a member of the same protected class as the plaintiff; 2) the employer criticized the plaintiff's work performance in terms degrading to her protected class; 3) the employer made invidious comments about others in the plaintiff's protected class; 4) the employer treated more favorably employees not in the protected class; 5) the sequence of events leading to the adverse employment action; and 6) the timing of the adverse employment action.

Paluh v. HSBC Bank USA, 409 F. Supp. 2d 178, 191 (W.D.N.Y. 2005) (applying the circumstances identified in Chambers, 43 F.3d at 37, a Title VII case, to the ADA context).

While defendant maintains that legitimate business concerns drove the adverse employment decision, plaintiff argues that the circumstances surrounding her termination give rise to a reasonable inference of discrimination (see Pl. Opp. Mem. at 12-13), as "it just seemed a little too convenient that [her] job was eliminated when [she] was trying to come back to work" (Pl. Dep. at 41.)  Plaintiff contends that "[i]t wasn't until after [she] complained of disability discrimination that the defendant

28

claimed that most of the plaintiff's duties had been offshored" (id. at 12). She also argues that defendant's RIF and "off-shoring" explanations (id. at 3, 9-10) were merely pretext for defendant's unwillingness to accommodate her disability (see id. at 10; Compl. [Doc. #1] at 5 ¶ 29), as her "position could not have been offshored since many of her responsibilities required FBI clearance" (Pl. Opp. Mem. at 12).

Yet plaintiff acknowledges that she was an at-will employee (Pl. Dep. at 62), and does not dispute that CSC was conducting a RIF initiative[10] (see Pl. R. 56(a)(2) Stmt. ¶ 44; Pl. Dep. at 17-18), although she did not know the details of the RIF (see Pl. Dep. at 135) and admits that all of her workload, except the work performed for the Department of Education, could have been performed overseas. (See Pl. R. 56(a)(2) Stmt. ¶ 129, 137, 138; Pl. Dep. at 78-80, 125.)

Plaintiff did not think her job would be off-shored (see Pl. Dep. at 55-56) and did not know when her job was eliminated (see Pl. Dep. at 41-42; Pl. Ex. C), but she does admit that her supervisor, Michael Bayer, was instructed in early spring 2003 to reduce the MFA Group by four full-time positions, and that the temporary employees on loan from the IWO division (which

---

[10] Launched in spring 2003, Project Capricorn's purpose was to reduce the number of U.S. employees by shifting more easily transferable work overseas, while retaining less easily transferable work for the reduced U.S. workforce. (See Def. Ex. 22 ¶ 7.)

constituted three full-time positions) were the first to be let go.  (See Pl. R. 56(a)(2) Stmt. ¶¶ 50, 61.)  Ms. Chasse stated that she didn't believe Bayer harbored animus against her (Pl. Dep. at 170), and believed Bayer's use of both objective and subjective criteria to decide which member of the MFA Group to lay off was reasonable (Pl. Dep. at 46; Pl. R. 56(a)(2) Stmt. ¶¶ 63, 81).  Plaintiff does not contest that the five MFA employees who conducted on-site automation support for CSC clients were indispensable (see Pl. Dep. at 197-99; Pl. R. 56(a)(2) Stmt. ¶¶ 64-79), nor that Glaude, the only other member of the MFA Group to work in CSC's Meriden offices, ranked higher than plaintiff in fiscal year 2002 performance appraisals and the skills assessment survey (see id. ¶¶ 83-99).  Plaintiff admits that Bayer weighed all the relevant factors and decided to eliminate plaintiff's position instead of Glaude's.  (See id. ¶ 134.)  Plaintiff also admits that Glaude, who had become an "expert" in Automation Point beginning in 2000, was devoting much of his time converting CSC clients to Automation Point, and that plaintiff did not possess the skills necessary to perform this work.  (See id. ¶¶ 104-06, 130; Pl. Dep. at 145-46, 149.)

The chronology of plaintiff's termination in relation to her leave period and when she disclosed her disability is not in dispute.  Plaintiff admits that in June 2002, prior to going on leave, she informed Bayer that she would no longer be able to

serve as a quality manager for ISO certifications, a
responsibility that required approximately 15-20 hours per week
of plaintiff's time.  (See Pl. R. 56(a)(2) Stmt. ¶¶ 121-23; Pl.
Dep. at 104.)  She does not dispute that by the time she went on
leave on August 13, 2002, the conversion work for her largest
client account, the Department of Education, was 75%-80% complete
(see id. ¶ 115; Pl. Dep. at 118-19), nor that Glaude possessed
the computer skills required to perform the remaining work (see
Pl. R. 56(a)(2) Stmt. ¶¶ 128-29.).  However, plaintiff believed
that the account would eventually return to a "maintenance
level," which she could perform remotely.  (See Pl. Dep. at 121.)

Ms. Chasse's perceived experience of discrimination stems
from her apparent misunderstanding of CSC's reinstatement and
twelve-month leave policies, as well as the scope of her
protections under the FMLA and the CFMLA.[11]  In her deposition,

---

[11] The letter sent by CSC Human Resources to plaintiff on
August 13, 2002 reads in relevant part:

> If your absence is due to your medical condition and
> extends beyond 12 weeks, CSC Policy allows up to a
> maximum of 12 consecutive months of medical leave.  If
> you are unable to return to work after 12 months, your
> employment with CSC will be administratively
> terminated. . . .

(Def. Ex. 4 at 1.)

The CSC Employee Handbook reads in relevant part:

> Medical leaves may be granted for up to 30 calendar
> days and may be extended for successive periods of up
> to 30 calendar days for up to a total (including all

Ms. Chasse says, "I was under the assumption I had a job. . . . when I read this,[12] when I signed the papers, when I went on leave. . . why bother going through all that if I knew my job was gone.  That was. . . a federally guaranteed leave of absence." (Pl. Dep. at 66-67.)  Plaintiff, while admitting that under the company's reinstatement policy she was not guaranteed a job at CSC after her "period of statutory job protection under the FMLA and CFMLA concluded on December 3, 2002" (Pl. R. 56(a)(2) Stmt. ¶ 34.), apparently believed that CSC's requirement to make a "reasonable effort to reinstate [her] to [her] former position or to place [her] in a comparable position" (id. ¶ 31) would persist for the entire duration of her leave and meant that she would

----

periods of family and medical leave) of 12 consecutive months of unpaid leave. . . .

If you return to work within 30 calendar days of the effective date of your approved leave, it is CSC's practice to reinstate you to your position.  Unless otherwise required by law, (e.g., Family Medical Leave Act. . .), CSC cannot guarantee that you will be reinstated to your position when you return from a leave that is in excess of 30 days.  Your continued employment in such circumstances is subject, at the time the leave is scheduled to end, to the availability of a position for which you are qualified.  However, CSC will make a reasonable effort to reinstate you to your former position or to place you in a comparable position.

(Def. Ex. 5 at 2-3, 5.)

[12] It is unclear from the transcript whether plaintiff refers to the Employee Handbook or the August 13, 2002 letter.  See infra note 11.

actually be "give[n]. . . [her] job or a comparable position at the end of [her] 12 months [of leave]" (Pl. Dep. at 69). Similarly, and unfortunately, the mechanics of "administrative termination" were apparently unclear to plaintiff (see Pl. Dep. at 138).  However regrettable plaintiff's confusion, she comes forward with no evidence to rebut the neutrality of CSC's unpaid leave policies or its decision to terminate her after twelve months of unpaid leave.  Thus, the record shows that plaintiff was administratively terminated after her leave period on September 9, 2003, at a time when Dr. Zell said she could not return for two to three months.

Finally, plaintiff offers no evidence that CSC's failure to find her a comparable job was unlawful in any way.  Job listings for available CSC positions were sent to her in August 2003 (see Pl. R. 56(a)(2) Stmt. ¶¶ 170-79), but she did not apply to any vacant CSC jobs because she assessed herself as being unqualified for the positions and believed the work required to be too physically taxing.  (See Pl. Dep. at 207-10.)

Based on these undisputed facts, no inference of an ADA violation can be made and plaintiff has failed to otherwise come forward with evidence from which a jury could reasonably infer that the reasons for CSC's decision to terminate her employment were a pretext for refusing to accommodate her need to work from home in violation of the ADA.

33

**IV.   CONCLUSION**

Because plaintiff has failed to come forward with sufficient evidence to rebut defendant's showing that she fails to satisfy the third and fourth prongs of her prima facie case, Defendant's Motion for Summary Judgment [Doc. # 27] will be GRANTED and this case will be closed.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 28th day of September, 2006.**